UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

      Plaintiff,

                                            Case No. 05-CR-80955

v.

                                            HONORABLE AVERN COHN

D-8 BRIAN RONNEL GARRETT, and
D-25 KIM VERNELL WILLIAMS,

      Defendants.

_____/

## MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS

### I. Introduction

This is a criminal case. Defendants Brian Ronnel Garrett (Garrett) and Kim

Vernell Williams (Williams) are charged with (1) conspiracy to distribute five kilograms

or more of cocaine in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(b); (2) money

laundering in violation of 18 U.S.C. § 1956; and (3) conspiracy to launder money

instruments in violation of 18 U.S.C. § 1956(h).

Before the Court are Defendants' motions to suppress evidence obtained during

a traffic stop and subsequent search of their vehicle. Defendants contend that (1) there

was no probable cause to make the initial traffic stop, (2) Defendants were detained

without reasonable suspicion during the traffic stop, (3) the initial search of the vehicle

was made without probable cause, and (4) law enforcement authorities lacked probable

cause to perform subsequent searches of the vehicle and/or exceeded the scope of

Defendants' consent to search. A hearing on the motion was held on October 3, 2007

at which the Court heard testimony and reviewed documentary evidence.  For the reasons that follow, Defendants' motions will be denied.

## II.  Factual Background

### A.  The Traffic Stop[1]

On February 26, 2003, Texas State Trooper Jason Henderson (Henderson) was on patrol on I-40 in Gray County, Texas.  At about 11:28 a.m., he observed a black two-door Lincoln Mark VIII (the Lincoln) that appeared to be traveling over the speed limit.  Moving radar confirmed that the Lincoln was traveling at a rate 74 miles per hour in a 70 miles per hour zone.  Henderson also "paced" the Lincoln by driving behind it to ensure the accuracy of his radar.  He then signaled for the driver of the Lincoln, Williams, to pull over; she complied.

Henderson approached the Lincoln and informed Williams that she had exceeded the speed limit.  He assured her, however, that he planned to issue only a written warning, not a citation.  Henderson then asked for and obtained identification from both Williams and Garrett, the latter of whom was sitting in the front passenger seat.  Williams gave Henderson her driver's license; Garrett furnished a personal identification card issued by the Michigan Secretary of State.  Williams also informed Henderson that the Lincoln belonged to a third party.

Henderson testified that he customarily asks drivers to step out of their cars and sit in the front seat of his cruiser during traffic stops.  He made this request of Williams

_____

[1] The traffic stop and subsequent events that occurred along the highway were captured by a video camera mounted on the police cruiser.  The video recording also includes audio captured by two microphones: one in the interior of the police cruiser and one affixed to the officer's belt.

after receiving the Defendants' identification, and she complied. Henderson then read Williams's information over the radio to a dispatcher for the purpose of running a routine license check through the Texas Department of Public Safety computer system.

While Henderson waited for the results of the license check, he asked Williams numerous questions about where she was going. Henderson testified that he customarily asks these sort of questions during traffic stops. Williams told Henderson that she was going to Amarillo to visit a friend, Marie Brown. Williams said that she was not sure where Marie Brown lived despite having visited her in Amarillo the previous year and was therefore meeting her at a local mall. Williams said that Brown had "recently" moved to Amarillo, arguably contradicting her earlier statement that she had visited Brown in Amarillo the previous year. Williams also told Henderson that she and Garrett had known each other for about three years and that they were merely friends, not involved romantically. After a few minutes of conversation, Henderson received a radio message informing him that the license check of Williams had come back clean. He then read Garrett's information to the dispatcher.

Henderson then exited the cruiser while Williams remained in the front seat. Henderson approached the passenger side of the Lincoln and proceeded to ask Garrett a series of questions similar to the ones he asked Williams. The in-car microphone recorded Williams saying "please say Amarillo, please" to herself as Henderson approached the Lincoln. Garrett's answers contradicted Williams's. Specifically, Garrett told Henderson that he and Garrett were going to visit family members in California, including a man named Sherman Oates, and that Williams was his girlfriend. During the conversation, Henderson told Garrett that his eyes looked strange and that

3

he wondered whether Garrett had taken "uppers" or caffeine pills or had previously suffered a head injury. Garrett explained that he had astigmatism.

After his conversation with Garrett, Henderson returned to his cruiser and a few moments later received a radio message indicating that the number on Garrett's personal identification was invalid. The dispatcher stated that Garrett was associated with another identification number. Henderson then issued the written warning to Williams, and she signed a form acknowledging receipt. Henderson asked Williams if there was any contraband or large sums of currency in the vehicle. Williams responded in the negative. Henderson asked permission to search the vehicle, and Williams twice responded "sure".

## B. The Search

Henderson approached the passenger side of the Lincoln and told Garrett that Williams had given him permission to search the vehicle. He asked Garrett to step out of the vehicle and conducted a pat down search. Henderson then searched the vehicle and discovered a false compartment in the passenger-side rear seat area. In his report, Henderson stated that "it was obvious that a false compartment had been constructed and could be seen by removing a small speaker cover that was covered by a black fabric and had been glued down."

Henderson advised the Defendants of what he found in the Lincoln and instructed them to drive the vehicle to Richardson's Texaco station in McLean, Texas, while he followed in the police cruiser. In McLean, Henderson gained access to the false compartment he had identified and discovered that it contained $220,000 in U.S. currency. Henderson then requested that a K-9 unit be sent to the scene. A drug

sniffing dog was brought in and conducted an open air sniff on the exterior of the vehicle, responding with several alerts indicating the presence of narcotics in the vehicle.  Henderson locked the Lincoln and maintained possession of the keys.  A subsequent search of the Lincoln on March 1, 2003 revealed another compartment, located between the rear seat and the trunk, containing an additional $503,000 is U.S. currency.

### III.  Analysis[2]

### A.  Illegal Stop

Defendants first dispute that Henderson had the requisite probable cause to make the initial traffic stop.  A police officer who has probable cause to believe a civil traffic violation has occurred may stop an automobile regardless of his or her subjective motivation for doing so.  Whren v. U.S., 517 U.S. 806, 813 (1996); U.S. v. Ferguson, 8 F.3d 385, 391-92 (6th Cir. 1993) (en banc), cert. denied, 513 U.S. 828 (1994).  In Whren, the Supreme Court stated that a line of prior cases

> foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.  Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

---

[2] Although the events in question took place in Texas, the parties agree that Sixth Circuit law applies.  In any case, the law of the Fifth Circuit is not substantially different from the law cited herein.

517 U.S. at 813.  Because the police in <u>Whren</u> had probable cause to believe that petitioners had committed a traffic offense, the Supreme Court held that the stop was legal regardless of the officer's subjective motivations for making the stop.

Here, Henderson had probable cause to stop the Lincoln for a speeding violation. The accuracy of Henderson's moving radar and of his "pacing" of the Lincoln are not in serious dispute.  Any suggestion that Henderson had ulterior motives in making the stop is irrelevant under <u>Whren</u>.  The traffic stop was therefore legal.

### B.  Reasonable Suspicion to Conduct an Investigatory Detention

The Defendants next claim that even if there was probable cause to stop the Lincoln initially, Henderson unreasonably detained the Defendants in the course of the stop.  An officer "must conduct the [traffic] stop with the least intrusive means reasonably available and not detain the individual longer than necessary to effectuate the purpose of the stop, unless the officer has an articulable reasonable suspicion that the individual is engaged in criminal activity."  <u>U.S. v. Hill</u>, 195 F.3d 258, 267 (6th Cir. 1999).

The Sixth Circuit employs a "totality of the circumstances" analysis when determining whether or not an officer formed the requisite reasonable, articulable suspicion to detain a suspect for investigative purposes during a traffic stop.  *See* <u>U.S. v. Erwin</u>, 155 F.3d 818, 822 (6th Cir. 1998).  That is, the court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately."  <u>U.S. v. Smith</u>, 263 F.3d 571, 588 (6th Cir. 2001) (citing <u>U.S. v. Sokolow</u>, 490 U.S. 1, 9 (1989)).

6

Defendants rely on U.S. v. Avery, 137 F.3d 343, 350 (6th Cir. 1997) for the proposition that lying to the police about the origin or purpose of a trip does not by itself give rise to reasonable suspicion to detain a suspect for investigative purposes. However, the Avery court applied the "totality of the circumstances test" and concluded that the facts known to the officers at the time of the investigative detention, including but not limited to the defendant's contradictory statements concerning the details of his trip, gave rise to the requisite reasonable suspicion.  Id.

Here, Henderson had reasonable suspicion to detain Defendants for investigatory purposes because (1) the Lincoln was registered to a third party; (2) Williams appeared to contradict herself in response to Henderson's questions, stating that she had visited her friend Marie Brown last year but also that Marie Brown had moved to Amarillo only recently; (3) Williams seemed unsure of precisely where she was going in Amarillo and said that she intended to meet her friend at a mall, despite having visited her friend's home the previous year; (4) Garrett flatly contradicted Williams's story in numerous ways, including his statements that the Defendants were headed to California rather than Amarillo and that the Defendants were involved romantically rather than merely friends; and (5) Henderson thought that Garrett's eyes looked strange and believed that he may have taken "uppers."

Defendants' argument that lying to the police about the origins or purposes of a trip is not by itself sufficient to create reasonable suspicion ignores the "totality of the circumstances" test applicable in cases of investigatory detention.  While any individual fact listed above may not be enough to create reasonable suspicion, the totality of the

circumstances includes indicia of potential criminal activity sufficient to support Henderson's actions.

### C. Probable Cause To Search the Vehicle

Defendants also contend that Henderson lacked probable cause to search the Lincoln.  However, law enforcement officers need not have probable cause when a suspect consents to a search.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  In this case, Williams freely consented to the search of the Lincoln; the video and audio recordings of the stop show that Williams was not subject to any duress or coercion.  When Henderson asked permission to search the Lincoln, Williams twice responded "sure".  Henderson was therefore free to search the Lincoln.

### D. Scope of Consent

Finally, Defendants argue that Henderson unreasonably exceeded the scope of Williams's consent during his search of the Lincoln.  Additionally, Defendants argue that Henderson had no right to transport the Lincoln to Richardson's Texaco station in McLean in order to gain access to the secret compartments.  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment  is that of objective reasonableness."  Fla. v. Jimeno, 500 U.S. 248, 251 (1991).  The proper question is "what would the typical reasonable person have understood by the exchange between the officer and the suspect."  Id.  When a law enforcement officer asks a suspect whether he posseses any illegal contraband, the officer has implicitly informed the defendant that those items are the object of any search.  U.S. v. Garrido-Santana, 360 F.3d 565, 576 (6th Cir. 2004).

Here, before Henderson obtained Williams's consent to search the Lincoln, he asked her whether there were any illegal items inside the car. Henderson also specifically asked if there were any large sums of currency in the vehicle. In so asking, Henderson informed Williams that these items would be the object of his search. Williams consented to the search of her vehicle and did not impose any restrictions on the search. Thus the scope of Williams's consent would include any portions of the vehicle where large sums of money or other contraband could be hidden, including secret compartments.

After Henderson discovered the false compartment in the Lincoln, he had probable cause to search inside the compartment. U.S. v. Kincaide, 145 F.3d 771, 779 (6th Cir. 1998) (holding that a police officer had sufficient probable cause to conduct a search where the officer "recognized a secret compartment in the undercarriage" of defendant's vehicle "and knew from experience that such compartments were used to transport drugs and money"); see also U.S. v. Ledesma, 447 F.3d 1307, 1317 (10th Cir. 2006) (holding that "visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search"); U.S. v. Price, 869 F.2d 801, 804 (5th Cir. 1989) (holding that "[o]nce the agents had discovered the secret compartment they had probable cause to search the compartment itself"). Defendants' objections to this expansion of the search are therefore unavailing.

## IV. Conclusion

For the reasons stated above, Defendants' motions to suppress are DENIED.

SO ORDERED.


       s/Avern Cohn                       
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  October 25, 2007


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 25, 2007, by electronic and/or ordinary mail.


       s/Julie Owens                   
Case Manager, (313) 234-5160